UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
97 JUL 28 PM 3: 16
U.S. DISTRICT COURT
N.D. OF ALABAMA

MARY MARTIN, as Administratrix of the )
Estate of Cedric Martin, deceased, )
 )
Plaintiff, )
 ) CV 96-PT-1461-S
vs. )
 )
CITY OF BIRMINGHAM, et al., )
 )
Defendants. )

ENTERED
JUL 28 1997

## Memorandum Opinion

This cause comes on to be heard on a motion for summary judgment filed by the defendants on June 19, 1997. The individual officers argue that they are entitled to qualified immunity against the plaintiff's 42 U.S.C. § 1983 suit. The City of Birmingham argues, moreover, that it is not liable for the individual officer's actions because it had no custom or policy that caused the alleged Fourth Amendment violations. In addition, the defendants argue that the individual officer defendants are entitled to discretionary function immunity on the plaintiff's state law tort claim. The City of Birmingham asserts the same defense to the state law tort claim of the plaintiff as it does to the plaintiff's constitutional claims.

**Legal Standard**

55

On a motion for summary judgment, the court must assess the proof to ascertain whether there is a genuine need for trial. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). Summary judgment is appropriate only if this court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial responsibility of informing this court of the grounds for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes prove the absence of a genuine issue of material fact. <u>Id</u>. at 323. Once the moving party has met this burden, the nonmoving party "must produce evidence that shows there exists a genuine issue of material fact." <u>Cottle v. Storer Communication, Inc.</u>, 849 F.2d 570, 575 (11th Cir. 1988). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing the presence of a genuine issue for trial. <u>Celotex</u>, 477 U.S. at 324. The court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . . " in deciding whether to grant or deny a summary judgment motion. FED. R. CIV. P. 56(c). In resolving whether a given factual dispute requires submission to a jury, the court must view the presented evidence through the prism of the substantive evidentiary burden. <u>Anderson</u>, 477 U.S. at 254-55. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. <u>Welch v. Celotex Corp.</u>, 951 F.2d 1235, 1237 (11th Cir. 1992). Considering the above, this court must examine the evidence to determine the existence of genuine issues of material fact as to the various claims.

## Facts

The tragic circumstances from which the present claim arises are largely uncontested.

On the evening of July 9, 1995, the Birmingham Police Department and the Birmingham Fire and Rescue Department responded to a 911 call. The caller claimed that a disorderly male was breaking windows at Birmingham Towers apartments and was injured. The first police officer to arrive on the scene was officer Robert B. Goodwin ("Goodwin"). Shortly after Goodwin's arrival, Fire and Rescue Department Lieutenant Don Paul ("Paul") arrived at the apartments with three other firefighters. Doris Chatman ("Chatman"), manager of the apartments, led Goodwin and Paul to the apartment where Cedric Martin ("Martin") was. Chatman told them she thought that Martin was disabled and acting disturbed.

Goodwin knocked at the door of the apartment, announcing that he wished to see if Martin was well. The officer received no response. He remained outside the apartment for two minutes awaiting a response. While waiting, Goodwin allegedly heard moaning inside the apartment. Using a master key, Chatman opened the door of the apartment. Goodwin and Paul entered the apartment and noticed that broken glass and clothes covered the blood splattered floor.

As Goodwin walked into the bedroom area of the apartment, Martin "blind-sided" him and knocked him to the floor. A struggle followed on the floor of the apartment. Goodwin attempted to protect himself from Martin and restrain him. Throughout the struggle, Goodwin told Martin that he would get him some assistance if he stopped struggling. During this time, Goodwin did not strike Martin with his fists or any instrument, instead he attempted to hold Martin to the floor.

Meanwhile, Paul picked up Goodwin's nightstick, which had become dislodged during the struggle between Martin and Goodwin, and struck Martin in the groin and across the arms. The blows only temporarily stopped Martin. At that point, Goodwin called out for someone to get his radio and call for help. A firefighter, who was not involved in the fray, found the radio and called in a coded officer-in-distress message.[1]

As Martin and Goodwin continued to struggle, a host of other police officers converged

---

[1] The call was a code "1033" call, which was broadcast city-wide. "1033" calls are issued only in rare and highly dangerous circumstances.

3

on the scene. Sergeants George Wiggin ("Wiggin") and Charlie Hill ("Hill") arrived first. Both observed the broken glass and blood in the apartment. Wiggin also observed a hole in a wall with blood next to it.

Upon entering the bedroom, Wiggin saw Goodwin and Paul wrestling Martin on the floor. Eventually, Goodwin managed to pin Martin's arms and place handcuffs on Martin's wrists.[2] Goodwin held Martin's chin while other officers attempted to restrain Martin. Goodwin suffered several cuts and was covered in Martin's blood at this time. Paul and other officers had also come into contact with Martin's blood. Additional officers, Nolan, Wynn, Monte, Bentley, Lucas, Kimbrough and Brookhalt arrived to help. Wiggin and Hill remained removed from the struggle. Officers tied clothing around Martin to halt his struggling.

At this point, Chatman announced to the officers that Martin had AIDS (which was false). Goodwin disengaged from his fight with Martin and went with Paul and Wynn to the kitchen area of the apartment for treatment. Officer Russo arrived on the scene and did not touch Martin. After cleaning up in the kitchen, Goodwin and Wynn were instructed to leave for the hospital.

Following Goodwin's departure and a lengthy struggle with the remaining officers, Martin quieted. At first, the officers assumed that Martin had stopped struggling because he had suffered a heart attack. The remaining officers determined that Martin was distressed. Paramedics treated Martin on the scene. He became unconscious and although paramedics administered CPR, Martin did not revive. He was later pronounced dead. The actual cause of death was suffocation.

At some point before or during the melee, Martin had suffered a fracture of his thyroid cartilage. He had vomited and the vomit had lodged in his tracheal passages, suffocating him.

## Contentions and Analysis

---

[2] The officers handcuffed Martin's wrists in front of his body.

The plaintiff contends that the individual officers are not entitled to qualified immunity because they violated the decedent's Fourth Amendment right not to be detained with excessive force, his Fourteenth Amendment right to humane conditions of restraint and his Fourteenth Amendment right not to be discriminated against because of his mental illness.[3] The defendants contend, however, that the Fourth Amendment rights violation of which the plaintiff complains is too vague to be clearly established law. The only substantial basis that the plaintiff basis a Fourth Amendment violation is that officers applied a "choke hold" to the decedent.

> Whether a specific use of force is excessive turns on factors such as the severity of the crime, whether the suspect poses an immediate threat, and whether the suspect is resisting or fleeing. See Graham v. Connor, 490 U.S. 386, 394 [] (1989). Use of force must be judged on a case-by-case basis "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. Because this standard establishes no bright line, qualified immunity applies unless application of the standard would inevitably lead every reasonable officer in [the officer's] position to conclude the force was unlawful.

Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993). In examining whether officers used excessive force, the court examines "the need for force, the amount of force used, and the injury inflicted." Id. Given the violent and unrelenting behavior of the decedent, the officers restraining the decedent were justified in using force against him. In addition, other than use of the nightstick by Paul, no allegation exists that the officers used anything but their hands to restrain the decedent. The grasping of Martin's chin by Goodwin, if that is, in fact, what the plaintiff is referring to be the term "choke hold," was not an extreme amount of force, or at least not clearly so. "That the amount of force [the officers] used, even if unnecessary, was enough to violate the law was not plain; reasonable doubt existed, and still exists, on

---

[3] The court will only address the Fourth Amendment (incorporated) claim. The plaintiff's assertion that his equal protection rights were violated are absurd and the officer defendants are, at the least, protected by qualified immunity. The City of Birmingham is also not liable because it had no reason to know of "discrimination against the mentally ill" by those on its police force, excusing its failure to train against such a contingency. The claim that the defendants violated the plaintiff's rights against inhumane detention conditions will also fail. The officer defendants were not deliberately indifferent to a substantial risk of harm in their attempts to treat the plaintiff.

5

whether this amount of unnecessary force was unlawful." Post, 7 F.3d at 1560.  The law does not require defendants to act perfectly in addressing extreme circumstances.  No indication exists that other, more appropriate means could have been clearly used to restrain Martin.  Not all unfortunate occurrences result in causes of action.

The City of Birmingham has no policy to permit excessive force.  The City also conducts regular training of its officers in the appropriate manner of arrest.  Use of force is treated on a continuum, from voice commands and use of hands to the use of deadly force.  No reasonable inference exists that improper training caused the death.  The City is not liable.

It is likely that Alabama discretionary function immunity will protect the officers from liability under Alabama tort law. The court does not reach the issue [That issue or] of a possible negligence claim against the City.

## Conclusion

For the foregoing reasons, all of the plaintiff's federal claims against the officer defendants will be DISMISSED, with prejudice.  The federal claims of the plaintiff against the City of Birmingham will also be DISMISSED, with prejudice.  The state law claims will be dismissed, without prejudice.

This 28 day of July 1997.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE